UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CRYSTAL STOKES,                                          CIVIL ACTION
INDIVIDUALLY AND ON BEHALF
OF HER MINOR SON L.B.

VERSUS                                                   NO: 19-1642

GUY FABER, ET AL.                                        SECTION: "A" (3)

<u>**ORDER AND REASONS**</u>

The following motions are before the Court: **Motion for Partial Summary Judgment (Rec. Doc. 76)** filed by the plaintiffs, Crystal Stokes and Lennon Betancourt; **Motion for Summary Judgment (Rec. Doc. 77)** filed by the defendants, Sergeant Billy Matranga, Captain David Malveaux, and Sheriff Joseph P. Lopinto, in his capacity as Sheriff of Jefferson Parish. The motions, submitted on January 20, 2021, are before the Court on the briefs without oral argument.[1]

## I.  BACKGROUND

This complaint arises out of an incident that occurred at a public high school in Jefferson Parish. In the fall of 2018, Lennon Betancourt was a fifteen-year old 10th grader at Grace King High School in Metairie, Louisiana. In February 2018, Lennon was formally arrested by the Jefferson Parish Sheriff's Office for terrorizing in violation of La. R.S. § 14:40.1.[2] Lennon was suspended from Grace King and expelled. The criminal

---

[1] Oral argument has been requested but the Court is not persuaded that oral argument would be helpful in light of the issues presented and the parties' thorough memoranda.

[2] La. R.S. § 14:40.1, entitled Terrorizing, states:

> A.  Terrorizing is the intentional communication of information that the commission of a crime of violence is imminent or in progress or that a circumstance dangerous to human life exists or is about to exist, with the intent of causing members of the general public to be in sustained fear for their safety; or causing evacuation of a building, a public structure, or a facility of

charge was eventually dismissed.

Crystal Stokes is Lennon's mother. Ms. Stokes filed this action on behalf of herself and Lennon to recover for the wrongful arrest and school discipline that Lennon was subjected to in light of the terrorizing charge and the events giving rise to it. In earlier pleadings and rulings Lennon had been referred to simply as "L.B." given that he was a minor. After reaching the age of majority, Lennon moved to replace Stokes as plaintiff for the claims that she had brought as his representative. The Court granted that motion and now Lennon and his mother are co-plaintiffs; she remains as plaintiff on her own claims.[3]  (Rec. Doc. 63, Order granting motion to substitute party).

Plaintiffs describe the events giving rise to this action as follows:[4]

On or about the morning of February 21, 2018, Lennon was in his second period

---

transportation; or causing other serious disruption to the general public.

B. It shall be an affirmative defense that the person communicating the information provided for in Subsection A of this Section was not involved in the commission of a crime of violence or creation of a circumstance dangerous to human life and reasonably believed his actions were necessary to protect the welfare of the public.

C. Whoever commits the offense of terrorizing shall be fined not more than fifteen thousand dollars or imprisoned with or without hard labor for not more than fifteen years, or both.

[3] Now that Lennon has reached the age of majority and joined this lawsuit as a co-plaintiff to pursue his own claims, Ms. Stokes has no claims under federal law because all of the alleged constitutional violations in this case were premised on violations of Lennon's rights. Therefore, to the extent that Ms. Stokes has claims to assert, those claims could only arise under state law. In the motions that the Court has before it today, neither side has alluded to Ms. Stokes's claims much less briefed the viability of those claims but both sides seem to recognize that if Lennon's claims cannot survive summary judgment then neither can his mother's because her claims are derivative of Lennon's.

[4] This factual background is taken in large part from the pleadings, which have proven to be consistent with the deposition testimony of record.

health class at Grace King High School when his teacher, defendant Guy Farber,[5]  began a discussion with the students about the recent high school shootings elsewhere in the country. Mr. Farber stated to his students that the stereotypical high school shooter was a white male. Lennon, a male, was the only white person in the classroom of approximately 25 students and the only person who fit Mr. Farber's description of the stereotypical high school shooter. The other students began to make jokes about Lennon fitting Mr. Farber's description. For instance, several students jokingly asked Lennon to spare them from being shot. Lennon went along with the jokes and told them they would be okay. The entire class, including Mr. Farber, laughed at those jokes.

One student, continuing the joke about Lennon fitting Mr. Farber's description of the stereotypical high school shooter, got out of his desk, walked to the front of the classroom, drew a large caricature of Lennon on the white board affixed to the front of the classroom, and wrote the words "Future School Shooter" in large letters above the caricature. Another student asked the drawing student to change the hair on the caricature to match Lennon's hair more closely. Several students asked Lennon to pose next to the drawing so that they could take photographs. Mr. Farber observed the student draw the caricature and words above it and heard the students ask Lennon to pose next to the drawings so that they could take photographs. Mr. Farber took no steps to discourage his students' actions and instead laughed along with the students at the drawings on the whiteboard. In fact, Lennon testified that Mr. Farber told him to "get it over with," in other words to just acquiesce in allowing the other students to take pictures so that the whiteboard could be erased. (Rec. Doc. 77-5, Betancourt deposition at 26).

---

[5] The case caption does not suffer from a typographical error. Mr. Farber was incorrectly named in the original complaint as "Guy Faber."

To go along with the students and Mr. Farber's joke about him fitting Mr. Farber's description of the stereotypical high school shooter, Lennon complied with the students' request, got out of his desk, walked to the front of the classroom, and posed next to the caricature, while several of the other students took photographs with their cellphones. Mr. Farber observed all this conduct yet took no action to stop or even dissuade the students. Again, Mr. Farber laughed along with his students when Lennon posed next to the caricature while the students photographed Lennon. Lennon walked around the class giving hand gestures, such as "fist bumps" to the students in response to their jests asking Lennon to spare them. Mr. Farber observed all of this and laughed along with his class.[6]

The following morning, Lennon went to his first period class. The school's dean of students came to Lennon's classroom and asked him to come to the principal's office. At the office, he met with Sergeant Billy Matranga of the Jefferson Parish Sheriff's Office (another defendant herein), who was wearing a police uniform and badge, as well as carrying a firearm. Sgt. Matranga was assigned to be present daily at Grace King High School as part of the Police on Campus program. He had an office on the school grounds.

Sgt. Matranga restrained Lennon with handcuffs and placed him in the rear of a marked police vehicle parked outside of the school. Sgt. Matranga then brought Lennon to the Jefferson Parish Sheriff's Office Detective Bureau in Harvey, Louisiana where he was placed in a holding cell.

---

[6] The Court has reviewed the interview that police conducted of Lennon's co-defendant, the student who drew the caricature on the whiteboard. He was not quite as certain as Lennon that Mr. Farber was fully aware of what was taking place at the whiteboard that day.

Sgt. Matranga contacted Lennon's mother, Crystal Stokes, and asked her to come to the detective bureau. With Ms. Stokes present, Sgt. Matranga questioned Lennon about the photographs and possibly a video of Lennon posing next to the caricature in health class. Sgt. Matranga advised that the photographs of Lennon that the other students had posted circulated through social media sites and this caused parents and members of the media to contact the school and the Jefferson Parish Sheriff's Office. During the questioning, Sgt. Matranga learned from Lennon the circumstances that had led to the photographs being taken during health class.

Notwithstanding Lennon's explanation about the photographs, including that the whole thing was a joke that unfolded in Mr. Farber's presence, Sgt. Matranga decided to formally arrest Lennon for violating Louisiana's criminal terrorizing statute. Plaintiffs' allegation with respect to the arrest is that Sgt. Matranga lacked probable cause to arrest Lennon and was completely aware of his innocence yet he decided to arrest him in order to quell the public concern resulting from the other children posting the photographs of Lennon on social media.

Sgt. Matranga placed Lennon in handcuffs and then transported him to the Rivarde Detention Center in Gretna, Louisiana, where Lennon was formally booked, which included fingerprinting and having his "mug shot" taken. Sgt. Matranga prepared or gave information that went into a Juvenile Arrest Register, and Plaintiffs contend that Sgt. Matranga included false information, in fact deliberately lied in this document, in order to justify his decision to arrest Lennon for terrorizing.

Lennon spent the night in jail. The following morning, he went to the Jefferson Parish Juvenile Court. The judge in that court allowed Lennon to be released but only on the conditions of house arrest and that Lennon wear an electronic ankle bracelet

monitoring device. Plaintiffs contend that if the documentation that Sgt. Matranga provided to the juvenile court had not been false and had fully described the circumstances giving rise to the pictures, then the judge would surely have released Lennon on lesser or no conditions at all. Plaintiffs contend that Sgt. Matranga not only fooled the juvenile court judge with false information but that this same false information tricked the Jefferson Parish District Attorney into filing a Petition in the Jefferson Parish Juvenile Court on or about February 27, 2018, accusing Lennon of committing the crime of terrorizing.

Ms. Stokes was forced to retain an attorney to defend her son against the Petition filed in juvenile court. On March 28, 2018, the District Attorney dismissed the Petition. The juvenile court judge then removed the restrictions on Lennon's release.

Stokes and Lennon contend that Sgt. Matranga's actions caused and continue to cause them to suffer the loss of Lennon's freedom while he was arrested, jailed, and restricted by the Jefferson Parish Juvenile Court, the incurrence of attorneys' fees in connection with Lennon's wrongful arrest and prosecution, the loss of Ms. Stokes' income while she had to miss work to attend court and other matters related to this incident, damage to Lennon's reputation, as well as mental anguish and emotional distress. Plaintiffs' original complaint included reliance on 42 U.S.C. § 1983 for violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments, as well as a host of state law claims (due process, false arrest/battery, malicious prosecution, defamation, and generic delictual liability) against all defendants.

During the course of this litigation, Plaintiffs settled their claims against all of the Jefferson Parish School defendants (principal, disciplinarian, hearing officer, school board) including Mr. Farber. The only claims that remain for adjudication on summary

judgment or otherwise are those against Sgt. Matranga, Capt. Malveaux (supervisor), and Joseph P. Loptino, in his official capacity as the Sheriff of Jefferson Parish (employer of Matranga and Malveaux).[7]

A jury trial had been scheduled to commence on March 8, 2021. The trial was cancelled in light of COVID-19 General Order 21-1, which suspends jury trials in this district until at least May 1, 2021. (Rec. Doc. 90). In the order cancelling the trial, the Court advised counsel that it would set a telephone conference for the purpose of selecting a new trial date if the Court's ruling on the motions for summary judgment does not resolve all issues remaining for trial.

The parties' arguments in support of and against summary judgment are addressed below.

## II.    DISCUSSION

Defendants move for summary judgment on all claims (federal and state) as follows:

Defendants glean from the complaint that the specific constitutional right that Lennon is pursuing against them under the auspices of 42 U.S.C. § 1983 is a Fourth Amendment false arrest claim. With respect to that claim, Defendants argue that there was no Fourth Amendment violation because Sgt. Matranga had probable cause to

---

[7] Narrowing the case even further, Plaintiffs have clarified in their opposition that their pending claims are limited to § 1983 and state law claims against Sgt. Matranga with potential liability against Sheriff Lopinto being premised solely on vicarious liability for the state law claims. Although Plaintiffs initially alleged that Captain Malveaux was personally involved in arresting Lennon for terrorizing, they now have focused solely on Sgt. Matranga's conduct for the Fourth Amendment false arrest claim and related state law claims. There has never been an allegation that Sheriff Lopinto was personally involved in Lennon's case. Therefore, Captain Malveaux is entitled to summary judgment as to all claims asserted against him, and Sheriff Lopinto is entitled to summary judgment as to all federal claims because vicarious liability does not apply to those claims.

arrest Lennon based on the information known to him at the time. Defendants point out that during his voluntary statement to Sgt. Matranga, Lennon admitted to all elements of the crime of terrorizing perhaps with the exception of intent. As to intent, Defendants posit that the statute requires only general criminal intent, and that this element is something that a jury, not an arresting officer, would determine. Furthermore, Defendants point out that there is no Fourth Amendment violation if probable cause exists to arrest for *any* crime, and at the very least probable cause existed for arresting Lennon for disturbing the peace.[8]

Moving on to the bond restrictions imposed by the judge in juvenile court, Defendants point out that the judge's finding of probable cause breaks the chain of causation, at least as to the defendants named in this case, because none of them testified at the detention hearing, and therefore played no personal role in causing the limitations placed on Lennon's freedom. The officer who did testify in juvenile court, Detective Neil Hooks, is not a defendant in this case.

Failing the foregoing arguments with respect to the false arrest claim, Sgt. Matranga argues that under both federal and state law he is entitled to qualified immunity, and that Plaintiffs have not overcome the presumptive nature of the defense.

Finally, as to the state law claims, Defendants argue that because there was probable cause to arrest, the malicious prosecution claim fails. As to the defamation claim, Defendants argue that Plaintiffs have not pleaded any of the elements of that tort,

---

[8] In Louisiana disturbing the peace is a misdemeanor offense. *See* La. R.S. § 14:103. Under federal law, an officer may conduct a warrantless custodial arrest for a misdemeanor offense without violating the Fourth Amendment. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

and that they have not overcome the qualified privilege that exists in favor of police officers.[9]

In addition to filing their opposition to Defendants' motion for summary judgment as to all remaining claims, Plaintiffs have filed a cross motion for partial summary judgment on the issue of probable cause. This cross motion does not probe the question of whether the juvenile court and the District Attorney lacked probable cause to restrict Lennon's movements on bond and to charge him, in light of any taint caused by Sgt. Matranga's paperwork. As to this question, Plaintiffs contend that there are genuine issues of material fact as to whether Sgt. Matranga lied in documents that caused the detention and prosecution. Rather, the cross motion identifies two different points in time for which, according to Plaintiffs, probable cause did not exist to arrest Lennon—first, the de facto initial arrest when Sgt. Matranga removed Lennon from the school, handcuffed him, and transported him to the Harvey station for questioning; and second, the formal arrest on terrorizing charges following Lennon's voluntary statement at the Harvey station. As to the probable cause determination associated with these two

---

[9] Defendants' motion also challenges what they perceive from the pleaded allegations to be some type of negligent investigation claim, which they contend does not exist under either federal or state law. In their opposition Plaintiffs have clarified that none of their claims are premised on allegations of a negligent investigation. (Rec. Doc. 78, Opposition at 14). This issue is therefore moot.

The Court adds that Defendants' motion for summary judgment is intended to challenge *all* remaining federal and state law claims in this case. One of the difficulties that all of the defendants to this case had at its inception was discerning from the pleadings which claims were brought against which defendants. The Court identified this problem when it ruled on Farber's motion to dismiss because the pleadings invoked a litany of constitutional rights many of which seemed inapplicable to this case under Plaintiffs' own version of the facts. (Rec. Doc. 45, Ruling on motion to dismiss at 15 & n.7). Given that Plaintiffs' opposition does not allude to any claims other than the ones specifically addressed in Defendants' motion for summary judgment, it is only fair to assume that the moving defendants have correctly identified all remaining claims against them and properly challenged them on summary judgment.

points in time, Plaintiffs contend that the parties are in agreement that no genuine issues of fact exist, and that the pertinent evidence is undisputed; the parties dispute only the legal implications of the evidence vis à vis the issue of probable cause.

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (*citing Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (*citing Anderson*, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (*citing* Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (*citing SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

When faced with a well-supported motion for summary judgment, Rule 56 places the burden on the non-movant to designate the specific facts in the record that create genuine issues precluding summary judgment. *Jones .v Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). The district court has no duty to survey the entire record in search of evidence to support a non-movant's position. *Id.* (citing *Forsyth v.*

*Barr*, 19 F.3d 1527, 1537 (5ᵗʰ Cir. 1992); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300,

1307 (5ᵗʰ Cir. 1988)).

### *Fourth Amendment Claim – Probable Cause to Arrest*

A warrantless arrest by a law enforcement officer is reasonable under the Fourth

Amendment where there is probable cause to believe that a criminal offense has been or

is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing *United States*

*v. Watson*, 423 U.S. 411, 4147-24 (1976); *Brinegar v. United States*, 338 U.S. 160, 175-

76 (1949)). Whether probable cause exists depends upon the reasonable conclusion to

be drawn from the facts known to the arresting officer at the time of the arrest. *Id.*

(citing *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)). An arresting officer's subjective

state of mind, except for the facts that he knows, is irrelevant to the existence of

probable cause. *Id.* Importantly, the officer's subjective reason for making the arrest

need not be the criminal offense as to which the known facts provide probable cause. *Id.*

The Supreme Court has reiterated on many occasions that "the probable-cause standard

is a 'practical, nontechnical conception' that deals with 'the factual and practical

considerations of everyday life on which reasonable and prudent men, not legal

technicians, act.'" *Pringle*, 540 U.S. at 370 (quoting *Illinois v. Gates,* 462 U.S. 213, 231

(1983)). The probable cause standard is incapable of precise definition or quantification

into percentages because it deals with probabilities and depends on the totality of the

circumstances.[10]  *Id.* (citing *Gates*, 462 U.S. at 232).

The first arrest occurred when Sgt. Matranga removed Lennon from Grace King

---

[10]  Additionally, under Louisiana law a child may be taken into custody without a court order
or warrant by a police officer if the officer has probable cause to believe that the child has
committed a delinquent act. La. Ch. Code art. 814(A).

High School and transported him in handcuffs to the Harvey station to be interviewed about the picture posted on social media. Sgt. Matranga's deposition testimony is the only evidence of record that reveals the events leading up to this arrest, and the historical facts known to him at the time of the arrest. It is therefore uncontradicted.

Sgt. Matranga became aware of the situation at Grace King High School first thing in the morning on February 22, 2018, when the school principal, former defendant Sharon Meggs-Hamilton, contacted him and asked him to come to her office. (Rec. Doc. 77-6, Matranga deposition at 43). The principal showed Sgt. Matranga a hardcopy version of the picture of Lennon standing or posing next to the whiteboard drawing labeled "Future School Shooter." Ms. Meggs-Hamilton identified Lennon as the student in the picture, and she told Sgt. Matranga that the picture had been posted to social media. The principal confirmed that the picture was taken in one of the classrooms at the school. (*Id.* at 45). Ms. Meggs-Hamilton explained to Sgt. Matranga the concerns that had been raised by the picture because parents of other students had been calling the school, some had inquired about taking their kids out of school, and there was mention of the media getting involved. (*Id.* at 50). Sgt. Matranga stated that things started escalating very rapidly that morning. (*Id.*).

Lennon was removed from his classroom and brought to the principal's office that morning by Mr. Price, a school official. Sgt. Matranga recalled that this had been done before he spoke with the principal.

When Sgt. Matranga left the school grounds with Lennon in his custody, he had not spoken with anyone else about the investigation except for Ms. Meggs-Hamilton. (*Id.* at 64). Questioning Lennon at that point to determine his involvement in the incident or the meaning of the picture was not an option because Lennon was an

unrepresented minor; Lennon later confirmed that no one with law enforcement attempted to question him until his mother arrived. (Rec. Doc. 77-5, Betancourt deposition at 38). Sgt. Matranga explained that he opted to leave the school grounds to question Lennon because he wanted to conduct the interview on video but he had no such equipment at his campus office. (Matranga deposition at 57).

Lennon correctly points out that at this point in time when Lennon was first taken from the school in handcuffs by Sgt. Matranga, the officer had nothing more than a photograph of Lennon standing in front of a whiteboard drawing that read "Future School Shooter." At this point in time, Sgt. Matranga did not know who drew the picture, who labeled it, who posted the photographs on social media, or what Lennon meant to communicate by the pictures, if anything.

All of the foregoing is true—Sgt. Matranga knew no more than what the school principal knew when she concluded, undoubtedly driven by concerns about the recent school shootings around the country, that the appropriate course of action was to remove Lennon from his classroom and immediately contact law enforcement. Neither Ms. Meggs-Hamilton nor Sgt. Matranga erred on the side of just assuming that no crime of violence was imminent at that point in time. The Court is persuaded that Sgt. Matranga had probable cause to take Lennon into custody at that point. The Court has reviewed the photograph of Lennon that was presented to Sgt. Matranga that morning. Regardless of who actually drew the likeness of Lennon or added the "Future School Shooter" annotation, Lennon appears from the pictures to be voluntarily posing for pictures with a likeness of himself that contains a disturbing annotation suggestive of horrific violence—school shootings can be described in no other manner; there are no signs of coercion obvious from the picture. Lennon was awake in the picture. While the

Court would not characterize Lennon's countenance and body language in the picture as inherently threatening, it is likewise not obvious from the picture that he is joking or mugging for a camera or otherwise playing around with classmates. In fact, given the unthinkable tragic consequences of school shootings, no prudent officer would assume that anyone would simply joke about it. The principal had informed Sgt. Matranga about the disruption to the school and the calls from parents and the notoriety with the media that the photograph had caused on social media. The Court is not persuaded that the terrorizing statute would require that Lennon have actually been the individual who posted the photograph on social media; voluntarily posing for it is likely sufficient to constitute "communicating" information particularly given that a picture taken with a cell phone by classmates is more than likely going to end up on social media. The terrorizing statute does have an intent requirement, which the Court addresses more in depth below, but Sgt. Matranga was not required to peruse the text of the criminal code in order to effect the arrest. Moreover, intent could arguably have been inferred from the circumstances. Whether this could constitute proof in a criminal prosecution is a different matter altogether, and is not determinative of the legality of Sgt. Matranga's actions. As the Fifth Circuit has explained, the existence of probable cause is not determined by reference to a precise formula; rather it is present "when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed [] an offense." *Vance v. Nunnery*, 137 F.3d 270, 276 (5th Cir. 1998) (quoting *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996)). That is satisfied here.

Even if it were determined that probable cause to arrest for the crime of terrorizing was not satisfied as a matter of law at the time of the initial arrest, the Court

is persuaded that Sgt. Matranga is entitled to qualified immunity in conjunction with the initial arrest. The qualified immunity analysis first requires that the plaintiff has alleged a violation of a constitutional right; if so, the court turns to whether the officer's conduct was objectively reasonable in light of clearly established law at the time the challenged conduct occurred. *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citing *Anderson v. Creighton,* 483 U.S. 635, 639 (1987)).

Although the Fourth Amendment right to be free from false arrest, *i.e.*, arrest without probable cause, was clearly established at the time of the arrest, Plaintiffs cannot overcome the qualified immunity defense because arresting Lennon was not objectively unreasonable in light of the circumstances surrounding the incident for all of the reasons explained above. An arresting officer is entitled to qualified immunity unless there was no actual probable cause for the arrest and the officer was objectively unreasonable in believing there was probable cause for the arrest. *Davidson v. City of Stafford,* 848 F.3d 384, 391 (5th Cir. 2017). A police officer who reasonably but mistakenly concludes that he has probable cause to arrest a suspect is entitled to qualified immunity. *Tarver*, 410 F.3d at 750 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). Qualified immunity exists to give the arresting officer "breathing room" to make reasonable but mistaken judgments and protects all but the "plainly incompetent" or those who knowingly violate the law. *Davidson*, 848 F.3d at 391 (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). Even if probable cause did not exist at the time of the initial arrest, it could only be attributable to a mistaken but reasonable belief on the part of Sgt. Matranga.

The second arrest occurred when Sgt. Matranga formally arrested Lennon for terrorizing following Lennon's voluntary statement at the Harvey station. In addition to

what Sgt. Matranga had known at the time that he took Lennon into custody, at the time of the formal arrest occurred Sgt. Matranga had heard Lennon's side of the story explaining how the picture came to be and why he had posed with it and allowed himself to be photographed. Sgt. Matranga had also interviewed the classmate who drew the caricature of Lennon on the whiteboard and annotated it. Lennon points out that both he and his classmate explained to Sgt. Matranga that the incident was really just students clowning around and engaged in a joke with the teacher present in the classroom. Lennon stresses that Sgt. Matranga had no evidence to contradict their characterization of the whole incident as a joke, and that Sgt. Matranga even confirmed at his deposition that he had no specific reason to conclude that the boys were lying to him. Lennon's position then is premised on the contention that because Sgt. Matranga knew that the whole incident was really a joke that was misinterpreted, he lacked sufficient evidence of Lennon's *intent* to cause the disruption and fear that had actually resulted from Lennon's actions, this intent being a required element of the crime of terrorizing.

The first problem with Plaintiffs' position is that it was neither Sgt. Matranga's role to judge the credibility of Lennon's defense nor to determine whether the evidence was sufficient under the law to establish the element of intent. This is the job of prosecutors who have the discretion to decline to pursue criminal charges for the very reasons cited by Plaintiffs. Another role that prosecutors fulfill is researching the law to determine exactly how intent must be proven for a given criminal defense, and assessing whether the evidence at hand will allow them to meet their burden of proof. An arresting officer in Sgt. Matranga's position does not have the legal training to determine how a not often used criminal statute like terrorizing has been interpreted by courts so far as

the intent requirement is concerned, which under Louisiana law may be general or specific. It is clear from Sgt. Matranga's deposition testimony that he did not interpret the statute's intent requirement in the same manner that the court interpreted it in *State v. Lewis*, 43 So. 3d 973, 984-85 (La. App. 5th Cir. 2010), which following a comprehensive legal analysis concluded that to support a conviction the terrorizing statute requires proof of specific criminal intent to accomplish a particular consequence. The panel in *Lewis* did not just read the text of the statute to make this determination, which is what Plaintiffs are faulting Sgt. Matranga for failing to do. This Court, with far more legal experience and resources than Sgt. Matranga had at his disposal, was unable to resolve the statutory interpretation without resorting to legal research. And the Court notes that there were a dearth of annotations reported with respect to Louisiana's terrorizing statute. This bears out Sgt. Matranga's testimony insofar as he explained that he had never before or since arrested anyone for that crime notwithstanding that he is a veteran officer with many years of experience on the force. Thus, while the Court is persuaded that Sgt. Matranga's failure to credit the joke explanation did not deprive him of probable cause to effect the second arrest on the charge of terrorizing, at the very least he would be entitled to qualified immunity because a reasonable officer in his position would not necessarily have known what the State's burden would have been with respect to proving the requisite intent to commit the crime.

In sum, for all of the foregoing reasons, Sgt. Matranga and Sheriff Lopinto are entitled to summary judgment on the false arrest claim under both federal and state law.[11]

---

[11] Plaintiffs have not disputed Defendants' contention that the state law false arrest claim is subject to the same legal analysis as the federal claim.

### *Probable Cause for the Criminal Proceedings*
### *Malicious Prosecution Claim*

The next aspect of Plaintiffs' probable cause challenge pertains to what occurred after Sgt. Matranga formally arrested Lennon with terrorizing. The next decision makers in the criminal justice system were a juvenile court judge, whose role would be to determine whether there was probable cause to hold Lennon on the terrorizing charge or to release him on bond and to set appropriate restrictions, and the District Attorney, whose role would be to decide whether to pursue the terrorizing charge against Lennon. The juvenile court judge did find probable cause, and while she was willing to set bond for Lennon he was subject to certain restrictions on his freedom. (Rec. Doc. 77-7, Minute Entry – Judgment). Similarly, the District Attorney moved forward with filing a Petition in the juvenile court asking that court to adjudicate Lennon a delinquent for violating La. R.S. § 14:40.1, the terrorizing statute. (Rec. Doc. 78-7, Petition). The Petition states that the charge is being made following a "preliminary inquiry."

But Lennon's theory of the case is that the District Attorney did not conduct any type of inquiry other than to rely solely on the documents that Sgt. Matranga had prepared, in particular a Juvenile Arrest Register and Probable Cause Affidavit, when deciding to pursue the terrorizing charge. Lennon believes this to be the case even though there is no statement from anyone at the district attorney's office to confirm this suspicion. Lennon likewise contends that the juvenile court judge also found probable cause based solely on Sgt. Matranga's written Juvenile Arrest Register and Probable Cause Affidavit because even though the record contains no statement from the judge (or helpful transcript of reasons from the bench) to indicate what her reasoning was for finding probable cause, Lennon and Ms. Stokes were both in the courtroom that day and

they have both submitted declarations stating that Sgt. Matranga's statements were read in open court by another officer (presumably Det. Neil Hooks) and that it was right after those narratives were read that the judge found probable cause. (Rec. Docs. 78-5 & 78-6, Declarations).

Thus, according to Plaintiffs, Sgt. Matranga's written statements were the sole drivers of the judge's probable cause determination and the District Attorney's decision to pursue charges. As to those statements, Plaintiffs maintain that Sgt. Matranga made false statements and outright lied insofar as he stated that Lennon admitted during the interview that he intended to cause terror and create fear, which we now know to be an essential element of the offense.

There is no reason to doubt that the juvenile court judge and District Attorney relied on Sgt. Matranga's statements in the Juvenile Arrest Register and Probable Cause Affidavit. It is quite another matter, however, and one based completely on speculation given the absence of statements from those decision makers, to assume that they were tricked or fooled by anything that Sgt. Matranga wrote in the Juvenile Arrest Register and Probable Cause Affidavit. Plaintiffs are simply reaching too far when they claim that Sgt. Matranga's statements contain anything false much less an outright lie. The Court has reviewed the video interrogations that Sgt. Matranga conducted of Lennon, and while the Court agrees that Lennon does not admit to intending to cause any of the fear and disruption that did in fact occur, Sgt. Matranga did not say that Lennon admitted this intent. The pertinent statement reads as follows:

> ARRESTEE GAVE OFFICER A VOLUNTARY STATEMENT WITH HIS MOTHER'S PRESENCE [SIC] ADMITTING TO KNOWING HE WAS BEING PHOTOGRAPHED AND POSTED TO SOCIAL MEDIA, CREATING TERROR IN THE SCHOOL, STUDENTS, FACULTY, STAFF AND PARENTS.

(Rec. Doc. 78-3, P15 Juvenile Arrest Register; Rec. Doc. 78-4, P16 Juvenile Arrest Report and Probable Cause Affidavit).

The foregoing statement is factually correct and issues of fact do not foreclose that conclusion. It does not state or imply that Lennon admitted to intending to cause the particular consequence that occurred, and at best it is ambiguous as to whether it should or could be read to mean that Lennon affirmatively admitted to creating terror in the school. Admittedly, the statement could have been better written but it is consistent with Sgt. Matranga's understanding of the terrorizing statute as explained in his deposition. The Court notes that in their briefing where they purport to quote the statement verbatim, Plaintiffs repeatedly omit the comma that follows "social media" and precedes "creating terror." (Rec. Doc. 78, Opposition at 5; Rec. Doc. 89, Reply at 89). But this comma is important because it suggests that what follows is not necessarily part of what Lennon admitted in his interview.[12]

Moreover, while the record does not indicate whether the juvenile court judge or the District Attorney had Sgt. Matranga's narrative from his police report when deciding

---

[12]  Plaintiffs' case against Sgt. Matranga for the District Attorny's actions is even more specious because the elements of the terrorizing statute recited in the District Attorney's Petition are from the version of the terrorizing statute that was last in effect in 2001. Importantly, this version of the statute did not include the language that was later added to require specific intent. *See* Lewis, 43 So. 3d at 985 (discussing why La. R.S. § 14:40.1 now requires specific intent). In prior versions of the statute only general criminal intent was required and it would have been sufficient that false information was communicated that caused disruption—in other words, exactly what occurred in this case. If the District Attorney was relying upon this older version of the statute when deciding to file charges against Lennon, then any supposed mischaracterization by Sgt. Matranga regarding specific intent would be irrelevant because the prior version of the terrorizing statute did not require it. It also occurs to the Court that if the District Attorney could err in charging the crime as one of general criminal intent then the juvenile court judge could have made the same error in finding probable cause, and it would hardly seem fair to hold Sgt. Matranga to a higher standard of either legal research or statutory interpretation.

to move forward, the Court notes that the narrative comprehensively reflects what Lennon said at the interview including that he was only joking, and it does not suggest that Lennon admitted to intent.[13]

Under Louisiana law, the elements of the tort of malicious prosecution are: (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to plaintiff. *Lemoine v. Wolfe*, 168 So. 3d 362, 367 (La. 2015) (citing *Jones v. Soileau,* 448 So.2d 1268, 1271 (La. 1984)). Chief among these elements is the requirement that the plaintiff must sustain the burden of proof that the criminal proceeding was initiated or continued without "probable cause." *Miller v. E. Baton Rouge Par. Sheriff's Dep't*, 511 So. 2d 446, 452 (La. 1987). Second of importance in actions of malicious prosecution is the element of the defendant's malice. *Id.*

The Court has already addressed probable cause and in particular why if there was no probable cause to support the actions of the juvenile court judge and the District Attorney it cannot be attributed to Sgt. Matranga. But even beyond that the claim fails

---

[13] The Court notes that at Sgt. Matranga's deposition Plaintiffs' counsel pressed him on whether he believed that Lennon had actually admitted during the interview that he had created terror in the school, and Sgt. Matranga confirmed that he did believe so and he defended that position. (Rec. Doc. 77-6, Matranga deposition at 78). This is actually a different question than intending to create terror in the school when posing for the school shooter pictures. Plaintiffs suggest that since Sgt. Matranga defended this position he was clearly trying to convey something that wasn't expressed in the interview, thereby fooling the judge and District Attorney. The Court finds this probing into Sgt. Matranga's subjective belief to be irrelevant since the theory of the case is that the juvenile court judge and the District Attorney put blinders on and reviewed nothing but the written statement quoted above. And again, that statement is not false and is at best ambiguous.

on the malice element, which Plaintiffs did not address in their opposition.

There must be malice in fact, which may be demonstrated by any feeling of hatred, animosity, or ill will toward the plaintiff. *Miller*, 511 So. 2d at 453. It is not essential, however, to establish ill will; malice is found when the defendant uses the prosecution for the purpose of obtaining any private advantage. *Id.* And malice may be inferred from the lack of probable cause or inferred from a finding that the defendant acted in reckless disregard of the other person's rights. *Id.*

There is no evidence whatsoever in the case to support a finding of malice on the part of Sgt. Matranga. Plaintiffs' contention that he intentionally lied is not supported by the evidence and therefore provides no inference of malice. Even if the defendant is cast with the burden to prove that he acted with probable cause and without malice because the charges were dismissed prior to trial, *see Watson v. Church's Fried Chicken, Inc.*, 527 So. 2d 979, 981 (La. App. 4th Cir. 1988), Sgt. Matranga's deposition testimony provides a thorough explanation of why he took the steps that he did and malice played no role in it. At best, he misread a statute and did not write a statement that was a paragon of clarity but this does not constitute malice sufficient to support a malicious prosecution claim. Plaintiffs have not created an issue of fact on this claim.

### *Defamation Claim*

Finally, the sin qua non of a defamation claim is a false and defamatory statement concerning another. *See Costello v. Hardy*, 864 So. 2d 129, 139 (La. 2004) (citing *Trentecosta v. Beck*, 703 So. 2d 552, 559 (La. 1997)). Plaintiffs' defamation claim is premised on the contention that Sgt. Matranga made false statements in his probable cause affidavit and report but the Court has already explained why the evidence does not bear out this allegation. If even one of the required elements of the tort is lacking the

cause of action fails. *Id.* (citing *Douglas v. Thomas*, 728 So. 2d 560, 562 (La. App. 2nd Cir. 1999); *Kosmitis v. Bailey*, 685 so. 2d 1177, 1180 (La. App. 2nd Cir. 1996)). Plaintiffs have not created an issue of fact on this claim.

In sum, Defendants are entitled to summary judgment on the malicious prosecution and defamation claims.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Partial Summary Judgment (Rec. Doc. 76)** filed by the plaintiffs, Crystal Stokes and Lennon Betancourt, is **DENIED**.

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 77)** filed by the defendants, Sergeant Billy Matranga, Captain David Malveaux, and Sheriff Joseph P. Lopinto, in his capacity as Sheriff of Jefferson Parish, is **GRANTED**. All claims against these defendants are dismissed with prejudice.

February 10, 2021

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE